UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                               )<br>)<br>PERRY MENDES,                        )<br>)<br>Defendant                              ) | Crim. No. 24-10024-IT-3 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Massachusetts State Police (MSP) Trooper Perry Mendes and the other members of the MSP unit in charge of Commercial Driver's License (CDL) testing had tremendous power. The members of this small unit had the power to pass or fail applicants on their CDL skills test, including applicants – some of whom paid more than $10,000 to go to truck-driving school – who needed a CDL for their employment. They had the power and responsibility to protect public safety by ensuring that the only people licensed by the Commonwealth to drive heavy trucks and buses had proved they were qualified to do so – not because Mendes or his co-conspirators subjectively thought they were qualified, but because the applicants actually took and passed the demanding, three-part skills test that the Federal Motor Carrier Safety Administration mandates for all CDL licensees nationwide.

Mendes abused that power. For three years he conspired with other troopers to give passing scores to certain favored, "golden" applicants even if those applicants took an incomplete test – or even if they failed. Although Mendes's overall pass rate was only 26%,[1] he

---

[1] Mendes gave passing scores on only 26% of the 3,287 tests he gave between January 1, 2019 and April 12, 2022, when he retired. Ex. 264; PSR ¶ 26 n.3.

and his co-conspirators agreed that the pass rate for "golden" applicants would be 100%.

In light of Mendes's gross abuse of power and decision to put favoritism ahead of public safety, the government recommends, consistent with the parties' plea agreement, that the Court impose a sentence of 12 months' incarceration, one year of supervised release, a fine of $5,500, and a $600 mandatory special assessment. This sentence would be sufficient but not greater than necessary to achieve the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

## FACTS

Mendes joined MSP in 1985. He spent almost 30 years in the Commercial Vehicle Enforcement Section before transferring to the CDL Unit on June 22, 2014. He retired on April 12, 2022. Ex. 140; PSR ¶ 21(c).

As a member of the CVES a/k/a "Truck Team," Mendes came to know everything about inspecting tractor-trailers and other heavy trucks and knew how dangerous they can be. Indeed, he received several letters praising his performance in connection with a frightening incident in 2008 when a tanker truck carrying 9,000 gallons of gasoline jack-knifed in Wareham, causing the tanker trailer to detach from the tractor and tip precariously on its side. Doc. No. 271-2 at 9, 10, 21, 22.

In August 2017, Gary Cederquist joined the CDL Unit as the Sergeant in charge. Troopers transferred in and out of the unit at various times, but there were always about ten to twelve troopers, including Mendes. PSR ¶ 21.

Over a three-year period, from May 15, 2019, until his retirement on April 12, 2022, Mendes conspired with Sergeant Cederquist and three other troopers in the CDL Unit: co-

defendants Calvin Butner and Joel Rogers, and cooperating witness Matthew Davis. PSR ¶ 25.[2] They agreed that certain favored applicants, whom they called "goldens," would receive guaranteed passing scores on their CDL skills test even if they took an incomplete test, or even if they failed. PSR ¶ 25. Several of those applicants did, in fact, fail. Yet all the goldens received passing scores - their pass rate was 100%. PSR ¶ 26.

Three applicants to whom Mendes gave golden treatment were Anthony Papandrea, Benjamin Palmer, and Kazamie Kirby[3]:

- On January 31, 2019, Papandrea, a Belmont Springs driver, showed up for a skills test with Mendes. Mendes did not administer the Vehicle Inspection test or the Basic Control Skills (a/k/a Maneuvers) test, and gave Papandrea only a ten-minute Road Test which did not include going on a highway, as required. Nevertheless, Mendes gave Papandrea passing scores on all three test parts. Without proving that he was qualified, Papandrea received a Class B CDL. PSR ¶ 48(a).

- Benjamin Palmer met Mendes through his work driving for a tow truck company. When Palmer told Mendes he wanted to take his Class A CDL skills test, Mendes told him to make an appointment at Stoughton. Mendes said there was no reason to bring a test vehicle or a sponsor because Mendes would provide them. When Palmer showed up, Mendes let him use a dump truck - which is not a Class A vehicle - for his test. Palmer did not take a Road Test. On March 25, 2021, Mendes falsely reported in CSTIMS that he had administered a complete Class A skills test to Palmer, who passed. Without proving that he was qualified, Palmer received a Class A CDL. PSR ¶ 67.[4]

---

[2] Mendes was given an opportunity to cooperate but declined to do so. He was sent a target letter in December 2023 but chose not to speak with the government at that time. He was indicted in January 2024. Trial began on Monday, April 14, 2025. Mendes made numerous pretrial filings through April 5, 2025. *E.g.*, Doc Nos. 172, 176, 177, 178. At the eleventh hour, on Thursday, April 10, 2025, Mendes entered into a plea agreement with the government. Doc. No. 182.

[3] The names of all applicants identified in this memorandum came out during the trial, either because the applicants testified or otherwise. *See, e.g.*, Ex. 263 (summary chart identifying applicants by name).

[4] Mendes notes that Palmer "has twelve years' experience working on and operating heavy ruck while in the military, and continues to do so in his present employment." Doc. 271 at 6 n.8. The only reason the government can fathom why Mendes has included this information is to imply

- Kazamie Kirby grew up in the same neighborhood as Cornelius Rivers, an RMV road examiner who knew Mendes through work. After getting his Class B learner's permit, Kirby asked Rivers if there was anything he could do to help him get his CDL. Rivers said yes. He took Kirby's permit and later returned it, stamped. Kirby never took a skills test. And yet, on March 26, 2021, Mendes falsely reported in CSTIMS that he had administered a Class B skills test to Kirby, who had passed. Without proving that he was qualified, Kirby received a Class B CDL. PSR ¶ 68.

Mendes's passing scores for the above three applicants were not isolated incidents. When Cederquist texted co-conspirator Calvin Butner on January 20, 2020 that he was going to give a golden handshake to applicant Trevor Goolsby, Butner replied that he could get Mendes to help. Ex. 235. On May 31, 2021, Butner gave applicant Jerson Ayala golden treatment as a "favor for Perry." On August 12, 2021, Butner told Cederquist that a truck at the test site belonged to "Perry's golden," James Myers. Ex. 239.[5] On February 17, 2022, Mendes agreed to give applicant Russell Roberts golden treatment. Ex. 262.[6]

---

that, in Mendes's opinion, Palmer was qualified for a CDL even though he took an incomplete test. In other words, Mendes is still making excuses for his crimes. That is not acceptance of responsibility; it is the opposite.

[5] Mendes tries to excuse his conduct by citing the lack of evidence that this applicant "in fact failed, skipped, or was given a free pass on any required test component." Doc. 271 at 5-6. Mendes's statement illustrates a lack of appreciation for why his conduct was wrongful. The severity and danger of Mendes's agreement to give passing scores to all golden applicants is not minimized just because some goldens actually took and passed legitimate skills tests. Just as a conspiracy to commit an unlawful goal is complete when the agreement is made even if the goal is not accomplished, a conspiracy cannot be minimized by looking backward and seeing that not everything that could have gone wrong did.

[6] Cederquist texted Mendes, "Golden for Russell Roberts this afternoon," and Mendes replied with a thumbs-up emoji. Mendes's memorandum states: "This could just as easily represent an innocuous acknowledgment of a superior officer's message rather than knowing participation in misconduct, particularly since there was no related communication to or from Mr. Mendes, before or after the emoji was sent." Doc. 271 at 6. This is not only a tortured interpretation of a clear text exchange, it borders on Mendes recanting his acceptance of responsibility for his participation in the conspiracy.

Thus, the evidence included specific examples of Mendes participating in the conspiracy between January 2019 and February 2022. In addition, Davis testified that Mendes said Cederquist would "*keep asking him*" to give golden treatment, Apr. 17, 2025 Tr. at 171, which indicates a significant number of applicants, and the evidence was that Mendes always went along with Cederquist's requests for golden treatment.

## ADVISORY GUIDELINES SENTENCING RANGE

Mendes acknowledges that his offense level is at least 11. Plea Agreement (Doc. 182) ⁋3(a)-(d). Probation agrees with the government's position that Mendes's offense level is 13 because the 2-level enhancement in USSG 2J1.2(b)(3)(C) applies. PSR ⁋ 75. Mendes disagrees.

Section 2J1.2(b)(3) states: "*If the offense* (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) *was otherwise extensive in scope, planning, or preparation*, increase by **2** levels." (Emphasis added.) Subsection (C) applies here because the offense – the conspiracy – was extensive in scope, planning, or participation. Contrary to Mendes's interpretation, *see* Doc. 271 at 5-7, subsection (C) does not say "*If the defendant's role in the offense* … was otherwise extensive in scope, planning, or preparation …." (Emphasis added.)

As another judge wrote in rejecting the argument Mendes raises here:

> As an initial matter, I am not confined to considering only the individual acts committed by McPartland because this enhancement applies "[i]f the offense ... was ... extensive in scope, planning, or preparation." U.S.S.G. 2J1.2(b)(3)(C) (emphasis added). Thus, I look to all the relevant conduct of McPartland and his co-conspirators during this years-long conspiracy. The obstructive conduct of Defendants and their co-conspirators—the latter of which was all "within the scope of jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity"—was, collectively, extensive in scope, planning, and preparation.

5

*United States v. McPartland*, No. 17-CR-587 (JMA), 2021 WL 3409229, at *14 (E.D.N.Y. Aug. 4, 2021).

There can be no question that the agreement among Cederquist, Mendes, Butner, Rogers, and Davis to give guaranteed passing scores to favored CDL applicants was extensive in scope, planning, or preparation. The conspiracy lasted 3½ years (although Mendes did not participate in the last half-year because he had retired). During that time the conspirators had to plan and work together. They had to make sure that favored applicants were scheduled to be tested in Stoughton, not elsewhere, and by a trooper-conspirator, not some other examiner.

In addition, there were more than just a few golden applicants. The seventeen applicants identified in paragraphs 47 - 63 of the indictment and in the summary chart admitted as Exhibit 263 are just the ones the government was able to identify from the texts in Cederquist's iCloud account. There are other goldens mentioned in Cederquist's texts but insufficient information to identify their names. Testimony by Davis and Rogers confirms there were many more applicants. Davis testified that Mendes showed "frustration that Gary [Cederquist] would *keep asking him* for golden handshakes for applicants that he had on his schedule," and that Butner "seemed agitated or frustrated that Gary Cederquist was asking for goldens for his *applicants*," plural. Rogers testified that he first heard of the word "golden" from Butner. One day Butner mentioned that "he had *one of Gary's goldens* coming in," which meant "when *one of Gary's friends* comes in and he wants you to, you know, make sure they pass." The statements Butner made to Davis and Rogers, and that Mendes made to Davis, indicate that Cederquist's requests for golden treatment were neither unusual nor infrequent. And in any event, as explained *supra*, Mendes's role in the CDL scandal was not a one-off.

For these reasons, the 2-level enhancement in USSG 2J1.2(b)(3)(C) applies. That brings Mendes's total offense level to 13, which gives him a GSR of 12-18 months. Consistent with the parties' plea agreement, the government recommends a sentence of incarceration at the low end of the GSR, *i.e.*, 12 months.

## THE 3553(a) FACTORS

A. <u>The Nature and Circumstances of Mendes's Offenses Warrant a 12-Month Sentence</u>

As a member of the CDL Unit, Mendes was entrusted with a solemn responsibility to protect public safety. He knew the dangers posed by unqualified drivers of heavy trucks and buses – he had been a specialist in commercial vehicle enforcement for thirty years. He had seen serious accidents involving heavy trucks. But he didn't need to see them to appreciate the risks. Every driver knows to give way when a tractor-trailer wants to pass. Every parent needs to know that the driver of their child's school bus is qualified to transport children safely. Every pedestrian is extra careful before crossing the street when they see a transit bus approach. And for good reason: While every vehicle on the road poses a danger of causing fatalities and injuries, the danger posed by heavy trucks and buses is significantly greater.

Mendes tossed aside his responsibility and duty despite knowing the risks involved.

Moreover, he helped create and maintain a two-tiered applicant system. Mendes agreed with his co-conspirators to give passing scores to friends and other law enforcement officers even if they failed. But regular members of the public, including many who had paid over $10,000 to truck-driving schools, and many who needed a CDL to get or keep a job, had to play by the rules and take and pass the demanding skills test. No corner-cutting for them. It is precisely this type of crime that erodes the public's faith and trust in law enforcement officers.

This is not a case where a defendant is appearing before this Court based on an aberrant lapse in judgment. Mendes is before this Court because he showed a lack of judgment and lack of respect for the law for *three years*. The nature and circumstances of Mendes's conduct warrant a significant and meaningful sentence of incarceration.

B. <u>General Deterrence Mandates a Significant Sentence</u>

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court also must consider the need for the sentence to afford adequate specific and/or general deterrence to criminal conduct. In this case the Court should be particularly concerned with general deterrence.

Mendes and his co-conspirators are not the first MSP troopers to break the law. Ten members of the now-disbanded Troop E were convicted of stealing overtime pay. Like Mendes's crimes, the offenses committed by those troopers also implicated public safety – the money they stole was supposed to be used to pay for more troopers conducting sobriety checkpoints, among other things. While the conduct of other troopers does not in any way explain, excuse, or diminish Mendes's conduct, it does underscore the need for this Court to impose a sentence that takes general deterrence into account and sends a message to other members of law enforcement that criminal conduct will not be tolerated. A sentence without a significant period of incarceration would not accomplish this goal.

C. <u>Mendes's History and Characteristics Weigh in Favor of a Significant Sentence</u>

The government acknowledges that Mendes grew up in a dysfunctional family with horrific incidents of domestic violence, and that he had to work much harder than other children/teenagers so that he could earn much-needed income while simultaneously focusing on his studies and graduating from high school. PSR ¶¶ 94-95, 104, 109. However, and to his great

credit, Mendes has built a successful life as an adult. *See generally* Mendes's Sentencing Memo. (Doc. No. 271) at 8-12. He graduated from high school and completed some college courses. PSR ¶ 114. He and his wife have three children with whom he is very close. PSR ¶¶ 105-107; Doc. 272-1 at 3-12. He is also close with several of his siblings as well as a niece. PSR ¶ 109; Doc. 272-1 at 13, 25-30. Mendes had a long and successful career with the MSP. PSR ¶ 115; 272-2; Def. Sentencing Memo. (Doc. No. 271) at 8-9. He has no untreated mental health issues, and no history of alcohol or substance abuse. PSR ¶¶ 112-13.

Mendes's history and characteristics weigh in favor of a significant sentence. *See* 18 U.S.C. § 3553(a)(1). Unlike so many of the defendants who appear before this Court, Mendes has not struggled with adult poverty, addiction, or a lack of opportunity. To be clear, while these challenges do not excuse criminal behavior, they sometimes provide context for criminal conduct. That is not the case here. There are no mitigating factors in this case, and Mendes should be sentenced accordingly.

D. <u>Mendes's Attempt to Distinguish His Conduct from Others' Is Unavailing</u>

Mendes tries to minimize his offense conduct by arguing that Cederquist was motivated by greed for some of his crimes (*i.e.*, extortion) where Mendes was not. Doc. No. 12, 14. But that is an apples-to-oranges comparison. The apples-to-apples comparison is Mendes's motive, as compared to Cederquist's motive, in agreeing to give passing scores to favored applicants. In any event, neither defendant's motive was altruistic, so any difference in motive is irrelevant. Furthermore, there is no dispute that Cederquist engaged in far worse conduct, and the government anticipates recommending a much longer sentence for him.

Next, Mendes notes that Cederquist is white whereas Mendes is black. Doc. No. 271 at

12 nn.10, 12. This is not a discrimination case and the distinction is irrelevant.

Mendes also maintains that Davis's conduct was worse because he admitted giving passing scores to far more applicants who did not take complete tests. Doc. No. 271 at 13. This argument is misleading. The government offered Davis an immunity and cooperation agreement only after requiring him to disclose the complete truth not only about what he knew but also about his own misconduct. Davis admitted his wrongdoing during these proffer sessions. There is no way to compare Davis's misconduct to Mendes's because Mendes never proffered.

Finally, with regard to the need to avoid sentencing disparities among defendants with similar records who have committed similar conduct, 18 U.S.C. § 3553(a)(6), Mendes asserts that he should be sentenced proportionately with (a) MSP troopers and Boston Police officers who stole overtime pay, (b) defendants who bribed RMV employees, and (c) law enforcement officers and other public employees sentenced for other fraud-based offenses. Doc. No. 271 at 14-17. Mendes then admits, however, that none of these defendants are comparable to him because they received financial gain whereas Mendes did not. *Id*. at 18. Mendes argues that his conduct was not as bad as the defendants he has identified because they were motivated by greed whereas he "exercised profoundly poor judgment." *Id.* Whatever motivated Mendes, his conduct was *more* egregious because he entered into an agreement to risk public safety and establish a two-tiered applicant testing system, and his offense was not a one-off lapse in judgment but a three-year conspiracy. A chart of all 24 comparators Mendes has identified, plus four other defendants similar to the 24, is attached as Exhibit A. Not only are the crimes different from Mendes's offenses, but, as the chart indicates, every defendant is distinguishable from Mendes in one or more critical ways: either they pled to an information, or they cooperated, or their crime

was not a conspiracy, and/or their crime did not involve a risk to public safety.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 12 months of imprisonment, one year of supervised release, a fine of $5,500, and a $600 mandatory special assessment. This sentence would be sufficient, but not greater than necessary, to reflect the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ Christine Wichers
Christine Wichers
Adam W. Deitch
Assistant U.S. Attorneys

### Certificate of Service

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 1, 2025.

/s/ Christine Wichers
Christine Wichers